# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-50419

CHARTER COMMUNICATIONS, INCORPORATED;
TIME WARNER CABLE TEXAS, L.L.C.,

*Plaintiffs-Appellees,*

v.

PREWITT MANAGEMENT, INCORPORATED, as General Partner
of WAP, Limited, a Texas Limited Partnership; WAP, LIMITED,
a Texas Limited Partnership,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, IN CASE NO. 1:16-CV-1268,
HONORABLE LEE YEAKEL, U.S. DISTRICT JUDGE

## BRIEF FOR PLAINTIFFS-APPELLEES

D. DOUGLAS BROTHERS
GEORGE BROTHERS KINCAID
   & HORTON, LLP
114 West 7th Street, Suite 1100
Austin, Texas 78701
(512) 495-1400

PAUL A. WERNER
STEVEN P. HOLLMAN
IMAD S. MATINI
ABRAHAM J. SHANEDLING
SHEPPARD MULLIN RICHTER
   & HAMPTON, LLP
2099 Pennsylvania Avenue NW,
   Suite 100
Washington, DC 20006
(202) 747-1900

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**<u>Plaintiffs–Appellees</u>**

Charter Communications, Inc. ("CCI"), and Time Warner Cable Texas, LLC ("Time Warner," collectively, "Charter" or "Appellees").  Charter certifies that Time Warner is a subsidiary of CCI, its parent company, which is a publicly-traded corporation that owns 10% or more of Time Warner.

**<u>Counsel for Plaintiffs–Appellees</u>**

*Sheppard, Mullin, Richter & Hampton LLP*
     Paul A. Werner
     Steven P. Hollman
     Imad S. Matini
     Abraham J. Shanedling

*George, Brothers, Kincaid & Horton LLP*
     D. Douglas Brothers

**<u>Defendants–Appellants</u>**

Prewitt Management, Inc. ("PM"), and WAP, Ltd. ("WAP," collectively, "Prewitt" or "Appellants").

**<u>Counsel for Defendants–Appellants</u>**

*Scott Douglass & McConnico LLP*
     Jane M. N. Webre
     Sam Johnson
*Naman Howell Smith & Lee LLP*
     Roy Lee Barrett

                        */s/ Paul A. Werner*

## **STATEMENT REGARDING ORAL ARGUMENT**

Charter requests oral argument to aid the Court in resolving this appeal.

# **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES .............................................................................. v

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES........................................................................2

STATEMENT OF THE CASE............................................................................3

    I.    Factual And Regulatory Background. ................................................7

        A.    The City Permits And The Parties' Agreements. ......................7

        B.    The Texas Cable Act Replaced The Historic Local Franchise Regime With A Streamlined State-Run Franchise Scheme. ................................................................14

        C.    After Obtaining SICFAs, Charter Stopped Paying Prewitt For Terminated Local Permits And Sued To Enforce Its Contractual Rights....................................................................17

    II.    Procedural History..........................................................................18

SUMMARY OF THE ARGUMENT .................................................................22

STANDARD OF REVIEW ..............................................................................26

ARGUMENT ..................................................................................................26

    I.    The District Court Correctly Held Charter's Payments For The City Permits Terminated When It Obtained SICFAs For Those Cities....................................................................................26

    II.    The District Court Correctly Held The Savings Clause Does Not Radically Modify The Agreements To Create A Perpetual Payment Windfall For The Prewitt Heirs...........................................39

CONCLUSION ...............................................................................................44

CERTIFICATE OF SERVICE .........................................................................46

CERTIFICATE OF COMPLIANCE.........................................................................47

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Cambranis v. Blinken*,
994 F.3d 457 (5th Cir. 2021) ..............................................................42

*Christensen v. Harris Cnty.*,
529 U.S. 576 (2000)..............................................................................44

*City of Dallas v. TCI West End, Inc.*,
463 S.W.3d 53 (Tex. 2015)..............................................................42, 43

*City of Rockwall v. Hughes*,
246 S.W.3d 621 (Tex. 2008) ..............................................................41

*Coker v. Coker*,
650 S.W.2d 391 (Tex. 1983) ..............................................................32

*Feiss v. State Farm Lloyds*,
202 S.W.3d 744 (Tex. 2006) ..............................................................35

*First Bank v. Brumitt*,
519 S.W.3d 95 (Tex. 2017)..............................................................37, 38

*Forbau v. Aetna Life Ins.*,
876 S.W.2d 132 (Tex. 1994) ..............................................31, 34, 38

*Gonzalez v. Denning*,
394 F.3d 388 (5th Cir. 2004) ..............................................27, 28

*Hess Corp. v. Schlumberger Tech. Corp.*,
26 F.4th 229 (5th Cir. 2022) ..............................................................26

*Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*,
352 S.W.3d 462 (Tex. 2011) ..............................................................37

*In re Caballero*,
272 S.W.3d 595 (Tex. 2008) ..............................................................40

*In re Liljeberg Enterprises, Inc.*,
304 F.3d 410 (5th Cir. 2002) ..............................................................26

*In re Washington Prime Group, Inc.*,
642 B.R. 771 (Bankr. S.D. Tex. 2022) ................................................42

*Ins. Distribs. Int'l (Bermuda) LTD. v. Edgewater Consulting Grp. LTD.*,
2010 WL 3522312 (W.D. Tex. Sept. 8, 2010) ....................................36

*Int'l Turbine Services, Inc. v. VASP Brazilian Airlines*,
278 F.3d 494 (5th Cir. 2002) ........................................................27, 30

*Interstate 35/ Chisam Road, L.P. v. Moayedi*,
377 S.W.3d 791 (Tex. Ct. App. – Dallas 2012) ................................30

*King v. Baylor Univ.*,
46 F.4th 344 (5th Cir. 2022) ..............................................................28

*L & A Contracting Co. v. Southern Concrete Services, Inc.*,
17 F.3d 106 (5th Cir. 1994) ..........................................................32, 33

*LNG Americas, Inc. v. Chevron Nat. Gas*,
2023 WL 2920940 (S.D. Tex. Apr. 12, 2023) ....................................32

*Pavecon, Inc. v. R-Com, Inc.*,
159 S.W.3d 219 (Tex. Ct. App. – Ft. Worth 2005) ...........................32

*RealPage, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
521 F. Supp. 3d 645, 656 (N.D. Tex. 2021) ................................*32, 33*

*Sitaram v. Aetna U.S. Healthcare of North Texas, Inc.*,
152 S.W.3d 817 (Tex. Ct. App. – Texarkana 2004) ..........................39

*Southwestern Gas Pipeline, Inc. v. Scaling*,
870 S.W.2d 180 (Tex. Ct. App. – Ft. Worth 1994) ...........................35

*Texas Cable & Telecomms. Ass'n v. Hudson*,
265 F. App'x 210 (5th Cir. 2008) ...................................................7, 29

*Texas Lottery Com'n v. First Bank of DeQueen*,
325 S.W.3d 628 (Tex. 2010) .............................................................40

*The Monrosa v. Carbon Black Export, Inc.*,
359 U.S. 180 (1959) ...........................................................................35

*Time Warner Cable, Inc. v. Hudson*,
    667 F.3d 630 (5th Cir. 2012) .................................................................16

*Travelers' Ins. v. Marshall*,
    76 S.W.2d 1007 (Tex. 1934) ..................................................................41

*United States v. Arrieta*,
    862 F.3d 512 (5th Cir. 2017) .................................................................26

*URI, Inc. v. Kleberg Cnty.*,
    543 S.W.3d 755 (5th Cir. 2018) ..................................................*34, 35*

*Wright v. Ford Motor Co.*,
    508 F.3d 263 (5th Cir. 2007) .................................................................40

## **Statutes**

28 U.S.C. § 124 ..............................................................................................1

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ............................................................................................1

28 U.S.C. § 1332 ............................................................................................1

42 U.S.C. § 1983 ..........................................................................................44

47 U.S.C. § 522 ............................................................................................43

47 U.S.C. § 542 ............................................................................................43

47 U.S.C. § 556 ............................................................................................43

Tex. Util. Code § 66.003 ..........................................................15, 16, 43, 44

Tex. Util. Code § 66.004 ..............................................................16, 40, 41

Tex. Util. Code § 66.014 ..............................................................................44

## **Other Authorities**

Fed. R. App. P. 4(a)(1)(A) .............................................................................1

Tex. Const. art. I, § 18..................................................................................44

U.S. Const. amend. I .................................................................................44

U.S. Const. art. I, § 10...............................................................................44

# JURISDICTIONAL STATEMENT

The U.S. District Court for the Western District of Texas had federal question and diversity jurisdiction over Charter's claims.  ROA.11 & ROA.1462–ROA.1463; 28 U.S.C. §§ 1331–32.  It also had jurisdiction over Prewitt's counterclaims based on diversity jurisdiction.  ROA.18 & ROA.2072–2074; 28 U.S.C. § 1332.  The parties also stipulated the District Court had jurisdiction over them and their claims.  ROA.4610.

Venue was proper in the District Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Charter and Prewitt's claims occurred in that District.  *See* 28 U.S.C. § 124(d)(1).

This Court has jurisdiction to entertain Prewitt's appeal from final judgment issued by the District Court pursuant to 28 U.S.C. § 1291.  The District Court entered final judgment declaring Charter was discharged of its payment obligation and Prewitt was not entitled to damages or any other relief on April 28, 2023.  ROA.24 & ROA.4049.  Prewitt timely appealed that judgment on May 25, 2023.  ROA.24; Fed. R. App. P. 4(a)(1)(A).

## <u>STATEMENT OF THE ISSUES</u>

**1.**     Did the District Court correctly hold that Charter's payment obligation to Prewitt tied to the life of specific local permits issued by cities to provide cable services terminated when Charter obtained state-issued franchises that replaced the city permits identified in the parties' agreements and the city permits reverted back to Prewitt pursuant to the express remedy under the agreements?

**2.**     Did the District Court correctly hold that the Texas Cable Act's Savings Clause preserved and did not abrogate or impact the parties' contractual rights and obligations, thereby ensuring Charter's payment obligation in fact terminated when it obtained entirely distinct state-issued franchises without any involvement by Prewitt that replaced specific local permits issued by cities as bargained for under the parties' agreements?

## STATEMENT OF THE CASE

**Introduction.**  With this appeal, Prewitt seeks to have this Court sign off on perpetual payments for specific city permits that were terminated decades ago. Prewitt pushes the novel theory that Charter must still pay the Prewitt heirs for wholly separate state-issued certificates of franchise authority that Charter obtained on its own, many decades later, under a fundamentally different franchise regime intended to terminate such local cable permits, and with no assistance from Prewitt or his heirs whatsoever.

The District Court correctly rejected Prewitt's interpretation of the Agreements in support of its perpetual payment windfall bid as inconsistent with their plain and unambiguous terms, the parties' clear intent to tie the payments (and limited relief for breach) to those specific city permits, and the relevant surrounding circumstances – including that, at the time the parties contracted but not now, only municipalities like the cities could permit cable systems.  The District Court likewise correctly rejected Prewitt's efforts to turn a statutory "savings" clause intended to ensure that the Texas Cable Act did not disrupt pre-existing contractual obligations into a radically different (and legally suspect) statutory "modification" clause locking in, as a matter of positive law, perpetual payments to Prewitt based on Charter's state-issued franchise authority Prewitt had

no hand in obtaining, or any other later authority Charter may obtain to provide cable service in the relevant Texas cities.

Charter, also known in the market as Spectrum, provides cable services in various Texas communities. Prewitt is a limited partnership that represents the interests of the Prewitt family members. Almost sixty years ago, W.A. Prewitt, Jr., obtained permits from the Texas cities of Waco, McGregor, and Temple ("city permits") to construct and operate cable systems in reliance on their public rights-of-way. He then sold those city permits to Charter's predecessors pursuant to a series of agreements in the 1960s.

In exchange for Mr. Prewitt's agreement to assign these city permits, Charter's predecessors agreed to pay him three percent of its gross revenue earned through operation of the systems operated under the permits for the "life" of those specific permits. That made sense. At that time, the cities were the *only* permit-issuing authorities, and the permits were *exclusive* – making them valuable. For that reason, the parties also contracted for a specific remedy if Charter's predecessor failed to pay for the permits: The agreements would terminate and the city permits would revert back to Mr. Prewitt, his heirs, and so on.

But in 2005, the Texas Legislature enacted the Texas Cable Act. That Act revoked the authority of local governments like the cities to issue cable permits and vested that authority exclusively with the State. Under that Act, Charter's

successor then obtained *non-exclusive* state-issued certificates of franchise authority – a.k.a., "SICFAs" – that were intended to and did end the "life" of the city permits.  As such, when Charter took over these systems, Charter stopped making payments under the parties' agreements for city permits that no longer existed or gave Charter any authority to operate its cable systems in the cities.

Charter then sued Prewitt, seeking declaratory judgments that the city permits – and attendant payment obligation – had terminated.  Prewitt counterclaimed and sought the opposite relief, asserting Charter's payment obligation essentially continued forever under an entirely different authority enacted many decades later that the parties did not conceive (and could not have) and that Prewitt had no role in at all.  Following a one-day bench trial, the District Court ruled for Charter, holding Charter's payment obligation ended, according to the plain terms of the parties' clear and unambiguous agreements, when it obtained SICFAs replacing the historic city permits.

Faced with a decision that did not go its way, Prewitt now pushes strained interpretations of the parties' agreements and the Act in service of an effort to keep perpetual payments flowing for nothing in return:

- Prewitt argues the SICFAs that Charter obtained on its own, under a different franchise scheme many decades later, are merely "new permits" under the agreements and, as such, its payment obligation continues apace.  But by their

plain terms, the agreements only refer to – and even define – the permits as those issued by these Texas *cities* – not any other potential franchising authority that may come along many years later. That is entirely understandable and fully consistent with the local franchising regime existing at the time.

- Prewitt argues that Charter's payment obligation is perpetual and not bound by any durational limit. But the agreements expressly limit its payment obligation to "the life" of the city permits. When the city permits were terminated by the SICFAs, their "lives" necessarily came to an end, as did Charter's payment obligation (and the agreements themselves).

- Prewitt argues the Act's "Savings Clause," which is modestly intended to ensure the Act does not impair or abrogate pre-existing contractual rights and obligations, does something far different – it radically rewrites the parties' agreement to make Charter's payment obligation free-standing and perpetual and deprive it of the bargained-for reversion remedy for breach. That proposed interpretation would turn the Savings Clause into a Modification – or a Perpetual Money for Nothing Windfall – Clause and thereby create serious legal – indeed, constitutional – problems.

Prewitt's arguments are all mistaken, and none can alter the plain and unambiguous text of the agreements and Texas Cable Act, which the District Court

correctly interpreted and applied.  This Court should affirm the District Court's sound, thorough, and well-reasoned judgment.

## I.    Factual And Regulatory Background.

### A.    The City Permits And The Parties' Agreements.

When cable operators entered the Texas market in the 1950s and 1960s, they had to obtain permission from municipalities to use public rights-of-way to construct and operate their systems.  ROA.4611.  That permission took the form of "franchise agreements" with the relevant local municipalities, which typically gave "exclusive" rights to the first cable operator in the market.  *Texas Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 212 (5th Cir. 2008); ROA.4611.  Under this local franchise scheme, a cable operator was thus required to separately negotiate agreements with each municipality where it sought to operate, which resulted in cable operators operating under varying patchworks of local agreements with different and burdensome terms, rights, and obligations.  *See Hudson*, 265 F. App'x at 212–13; ROA.4611.

In the early 60s, W.A. Prewitt, Jr., obtained municipal permits from the Texas cities of Temple, Waco, and McGregor (collectively, the "city permits") authorizing him to "construct, maintain, and operate community antenna systems (cable systems) in those cities."  ROA.4611.

***1964 Agreement.***  On March 12, 1964, Mr. Prewitt entered an agreement with Ameco, Inc., Charter's predecessor-in-interest, leasing to Ameco permits "obtained" from the "Texas cities of Waco, Temple, and McGregor" ("1964 Agreement").  ROA.4626; ROA.4612.  Under the agreement, Ameco agreed to construct and operate cable systems in Waco, Temple, and McGregor during the leasehold.  ROA.4612.  In exchange, the 1964 Agreement required Ameco to make an advance payment to Mr. Prewitt of $10,553.58, plus other costs that he incurred.  ROA.4627; ROA.4612.  Ameco also had to pay Mr. Prewitt an "additional sum" of three percent of the gross revenues received from the operation of the cable systems in the three cities.  ROA.4627; *see* ROA.4612.

The 1964 Agreement further provided an option to purchase the "city permits" outright.  ROA.4629.  Under Section 2, if Ameco exercised that option, it agreed to pay Mr. Prewitt three percent of the gross revenues generated annually from the operation of the cable systems in the three cities.  ROA.4629–ROA.4630; ROA.4612.  But this payment obligation was not indefinite: It only lasted "during the life of each [ ] assigned permit and amendments thereto," including "any holding over thereunder, renewals or extensions thereof."  ROA.4630.  The agreement expressly provided the payment obligation "shall run with the [city] permits and shall be and constitute a charge and lien against the same."  ROA.4630.

Ameco had the right to assign its purchase option and the permits. ROA.4629.  Thus, if Ameco exercised its purchase option, any subsequent assignment, transfer, or encumbrance of the city permits would be subject to the terms of the agreement.  ROA.4631.  Upon exercising the purchase option, Mr. Prewitt agreed to assign the "city permits" to Ameco.  ROA.4632.  To effectuate that assignment, the parties would enter an agreement incorporating the 1964 Agreement to "evidenc[e]" Ameco's "obligation to pay and perform to Prewitt each and every obligation" of the 1964 Agreement as well as "security instruments making same a charge or lien against" the city permits.  ROA.4632.  If Ameco did not exercise the option, and the lease expired, then the sole remedy was that the "city permits shall revert to and remain the property of Prewitt."  ROA.4629.

The parties recognized the 1964 Agreement only covered the specific "city permits" granted by the respective local municipalities.  Of course, these local city permits were all Mr. Prewitt had to lease, sell, or assign under the then-operative local cable franchise regime.  ROA.4611–ROA.4612.[1]  Section 1(d) of the agreement thus sensibly defined "the permits" and "the city permits" to mean the "permits from the cities."  ROA.4629.  The agreement also expressly recognized

---

[1] Pursuant to the 1964 Agreement, Mr. Prewitt incorporated the three Texas corporations that were subsidiaries of Ameco, Inc., and technically held the permits.  The three corporations were T.V. Cable, Inc., of Temple, T.V. Cable, Inc., of Waco, and T.V. Cable, Inc., of McGregor (collectively, the "Ameco Subsidiaries").  ROA.4612.

the permits Mr. Prewitt "obtained" and to which it applied were issued by the "cities of Waco, Temple, and McGregor." ROA.4626. And the agreement further defined Ameco's purchase option as an "option to purchase such city permits," ROA.4629, and that Mr. Prewitt had to assign the "city permits" to Ameco if and when it exercised the purchase option, ROA.4632. Ameco also acknowledged it was "familiar with the terms and status of the city permits now held by Prewitt," ROA.4635, and agreed to pay sums "called for by the permits" to the "granting cities," ROA.4628.

Ameco ultimately exercised the purchase option, and as required, the parties then entered instruments of assignment and chattel mortgages. ROA.4632.

**_Instruments Of Assignment._** In March 1965, Mr. Prewitt and Ameco entered three separate Instruments of Assignment (a.k.a., IOAs) for the city permits. ROA.4612. Pursuant to the IOAs, Mr. Prewitt transferred and assigned the city permits to Ameco to effectuate the 1964 Agreement. ROA.4612; ROA.4642–4657. The IOAs provided that Ameco assumed "each and every duty and obligation" under the 1964 Agreement. ROA.4643, ROA.4649 & ROA.4564. They further "incorporated" the 1964 Agreement in its entirety, thus making that agreement "a part hereof by reference for all purposes." ROA.4645, ROA.4651 & ROA.4656.

Effectuating the 1964 Agreement, the IOAs only applied to the permits issued by the cities. For example, each IOA, such as for Waco, referenced the ordinance passed and adopted by Waco's City Council as the "permit" or "such permit," ROA.4642, and also referenced the sale, assignment, transfer and delivery of "said permit" from Waco to Ameco, ROA.4643. The IOAs further provided that "in the event any new permit is granted by the Cit[ies]" of Waco, Temple, or McGregor, "such new permit shall be conclusively treated and considered as a renewal of the existing permit." ROA.4643–ROA.4644; ROA.4649–ROA.4650; ROA.4654.

The parties also agreed on an *exclusive* remedy if Ameco breached its payment obligation. Each IOA provided that "upon the breach of any such obligations by assignee, this [IOA] shall be of no further force or effect and such permit shall automatically revert" to Mr. Prewitt, his "heirs, executors, administrators and assigns." ROA.4645, ROA.4651 & ROA.4656. Thus, if Ameco or a successor breached the IOAs or 1964 Agreement, the Agreements would terminate and the permits would revert back to Mr. Prewitt or his heirs and so on. ROA.4645, ROA.4651 & ROA.4656.

The IOAs expressly contemplated further assignments of the city permits as well. Like the 1964 Agreement, the IOAs reiterated the payment obligation only ran "during the life of" the city permits, ROA.4643, ROA.4649 & ROA.4654, and

that "[t]he obligations to make such payments and perform such duties and obligations shall run with the permit and shall be and constitute a first charge and lien against the same at all times," ROA.4644, ROA.4650 & ROA.4655. Any assignment was also "subject to the terms" of the IOAs. ROA.4644, ROA.4650 & ROA.4655. As such, if the city permits were assigned, the obligation to make the payments would go with them, as would the remedy (reversion of the city permits) if the payments were not made. ROA.4645, ROA.4651 & ROA.4656.

*Chattel Mortgages.* On the same day Ameco entered the IOAs, it simultaneously executed three "chattel mortgages" in Mr. Prewitt's favor. ROA.4612; ROA.4658–ROA.4689. These mortgages functioned as "security instruments making [the payment obligation under the 1964 Agreement] a charge and lien" against the city permits, as required by Section 2(d) of the 1964 Agreement and the IOAs. ROA.4632.

Each city permit had a corresponding chattel mortgage. For example, the chattel mortgage for the Waco permit attached the Waco IOA and city permit as exhibits and applied to the referenced city "permit." ROA.4658. The city permits and IOAs – which incorporated the 1964 Agreement in its entirety – were also "incorporated" and "made a part" of the mortgages "in their entirety." ROA.4658, ROA.4668 & ROA.4678.

-12-

These mortgages had the same, exclusive reversion remedy as the IOAs in the event Ameco breached. Accordingly, in the event of "default," the secured party will "take all steps necessary to cause the permit in question to be transferred back" to Mr. Prewitt. *See, e.g.*, ROA.4658. Each mortgage further provided that "[t]his chattel mortgage shall apply to and bind said mortgagor, his personal representatives and assigns." ROA.4659, ROA.4669 & ROA.4679.

*1971 Settlement Agreement.* In 1971, Mr. Prewitt sued Ameco in Texas state court. He alleged that Ameco failed timely to develop cable systems and make payment for owning "the permits from the cities." ROA.4693; ROA.4613. Mr. Prewitt sought damages and a finding the city permits "ha[d] reverted to Plaintiff or in the alternative for reversion of same to Plaintiff" under the Agreements' reversion remedy. ROA.4693.

The parties settled the lawsuit shortly thereafter. ROA.4777. In doing so, Ameco agreed to make additional royalty payments to Mr. Prewitt for permits issued by three other Texas cities – Beverly Hills, Bellmead, and Woodway. ROA.4780–ROA.4784 (defining the permits as "the permits of the Cities of Woodway, Bellmead and Beverly Hills [as] referred to herein"). The payment obligations for these permits were substantially similar to the payment obligations under the Agreements. Among other similarities, the settlement agreement provided that:

- The payment obligation for the Beverly Hills, Bellmead, and Woodway permits lasted "during the life of such permits and amendments thereto," ROA.4781;

- The payment obligation "shall run with the respective permits" and shall remain in full force and effect, ROA.4781–ROA.4782; and

- If "any new permit is granted by either Woodway, Bellmead or Beverly Hills . . . such new permit shall be conclusively treated and considered as a renewal of the existing permit." ROA.4781–ROA.4782. The IOAs have nearly the exact same provision. *Compare* ROA.4781 ("in the event any new permit is granted by either Woodway, Bellmead, or Beverly Hills"), *with* ROA.4643 ("in the event any new permit is granted by the City of Waco").

The settlement agreement's payment obligations under Paragraph V for "the permits of the Cities of Woodway, Bellmead and Beverly Hills" were made a "part of" and "incorporated by reference" into the chattel mortgage for Waco "for all purposes." ROA.4784. The settlement agreement also contained the same exclusive reversion remedy as the Agreements. *Compare* ROA.4783 ("upon the breach of any such obligations" by Charter, "this instrument shall be of no further force or effect and such permit shall automatically revert" to Mr. Prewitt), *with* ROA.4645 ("upon the breach of any such obligations" by Charter, "this instrument shall be of no further force or effect and such permit shall automatically revert" to Mr. Prewitt).

### B. The Texas Cable Act Replaced The Historic Local Franchise Regime With A Streamlined State-Run Franchise Scheme.

For over five decades, Ameco and its successors paid three percent of their gross revenues from cable service in the six Texas cities to Mr. Prewitt and, later,

his successors, Appellants.[2]  These payments totaled millions of dollars.  *See, e.g.*, ROA.4622.

Then, in 2005, Texas enacted the Texas Cable Act to revoke the historic local franchise regime and replace it with a streamlined and efficient state-run scheme.  *See* Tex. Util. Code §§ 66.001 *et seq.*  With that Act, Texas aimed to, among other things, promote its interest in "encourag[ing] a fully competitive telecommunications marketplace," *id.* § 51.001(b)(2), as well as "reduc[ing] the cost and burden of regulation" on cable operators, *id.* § 51.001 (e)(1).

To eliminate the burden of obtaining disparate franchise authority for each city – and concomitant disparate rights and obligations – the Act specified standards for all SICFA franchisees and granted the Texas Public Utility Commission ("PUC") authority to issue non-exclusive "state-issued certificates of franchise authority," or "SICFAs," consistent with those standards.  *Id.* § 66.003.  Thus, the Act moved the authority for the issuance of cable television franchises away from municipal to state control via the PUC and put an end to the local franchise regime in place when the Agreements were negotiated and entered.  *See id.*

---

[2]  Appellant PMI is the General Partner of Appellant WAP, the successor to the interests of W.A. Prewitt, Jr., and his heirs.  ROA.4611.  Collectively, they are referred to as "Prewitt" herein.

Under the Act's state-issued franchise regime, municipal franchises, like the city permits, are permitted only "until the franchise agreement is terminated under Section 66.004 or until the franchise agreement expires." *Id*. § 66.003(a).  A municipal franchise terminates "on the date the commission issues" the SICFA. *Id.* § 66.004(b).  When a cable operator obtains a SICFA, its franchise fee obligations under previous municipal agreements also end, and it is instead required to pay each city in which it operates a franchise fee of five percent of gross revenues from cable service.  *Id.* § 66.005(a).  That was, to be clear, the entire point of the Texas Cable Act: to "cast[ ] to the wayside the agreements of most municipalities in Texas."  *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 642 (5th Cir. 2012).

Nevertheless, the Texas Cable Act also contains a "Savings Clause" to "save" certain pre-existing contractual rights and obligations.  The Savings Clause thus provides the Act is not intended to "adversely affect in any way the contractual rights, duties, and obligations existing and incurred by a [cable operator] . . . before the date a franchise expires," including "those obligations measured by and related to the gross revenue hereafter received by the holder of a [SICFA]."  Tex. Util. Code § 66.004(f).  Instead, contractual rights or obligations in effect on September 1, 2005, "shall continue in full force and effect, without the necessity for renewal, extension, or continuance . . . as though the revenue

generated by the holder of a [SICFA] continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority." *Id.*

The Savings Clause also purports to make it a precondition to the issuance or renewal of a SICFA "that the private contractual rights and obligations herein described continue to be honored . . . to the same extent as though the cable service provider continued to operate under its prior franchise or permit, for the duration of such [SICFA] and any renewals or extensions thereof." *Id.*

Between 2006 and 2011, Time Warner applied for and obtained (and later amended) SICFAs to cover the cities under the Agreements. ROA.4615–ROA.4616. The SICFAs were issued on the following dates covering the following service areas: Temple (02/16/2006); Bellmead (03/31/2006); Beverly Hills (05/15/2006); Waco (08/21/2006); McGregor (12/20/2011); and Woodway (12/20/2011). ROA.4615. Since obtaining SICFAs, Time Warner paid each of these cities the maximum franchise fee of five percent of its gross revenues from cable service, totaling millions of dollars annually. ROA.4615 & ROA.4622.

### C.  After Obtaining SICFAs, Charter Stopped Paying Prewitt For Terminated Local Permits And Sued To Enforce Its Contractual Rights.

CCI merged with Time Warner in 2016, and Charter became the successor-in-interest to the Agreements. ROA.4611; ROA.4617. In October 2016, Charter received copies of the Agreements. ROA.4617. Recognizing the SICFAs replaced

and terminated the city permits, Charter stopped paying Prewitt and filed suit to obtain a declaration the Agreements were terminated and unenforceable. ROA.4617.

## II.   Procedural History.

On December 2, 2016, Charter sued Prewitt for a declaratory judgment that the Agreements were no longer enforceable because the city permits terminated when Charter (via Time Warner) obtained the SICFAs.  ROA.11; ROA.1474– ROA.1475.  Charter also sought declarations that the Savings Clause violated the First Amendment and Contracts Clause of the U.S. Constitution and further violated and is preempted by the federal Cable Act.  ROA.1476–ROA.1479.

Prewitt counterclaimed for breach of contract and unjust enrichment for damages and equitable relief.  ROA.2044.  Prewitt alleged Charter breached the agreement by failing to make payments after October 2016.  ROA.2073.  Prewitt further alleged that Charter remained bound by its payment obligations under the Agreements and Savings Clause for as long as it operated in Waco, Temple, McGregor, Beverly Hills, Bellmead, and Woodway, and sought damages and continued payments.  ROA.2073.

The District Court held a one-day bench trial on August 21, 2018.  ROA.22. At trial (and during the course of the litigation as well), the parties agreed the terms

of the Agreements were clear and unambiguous.  ROA.2201; ROA.2737–2739; ROA.2748; ROA.4274; ROA.4296; ROA.4420–4422.

Prewitt also dropped its counterclaims based on the permits for Woodway, Bellmead, and Beverly Hills under the settlement agreement.  ROA.4237–4238. Prewitt conceded at trial that the settlement agreement's payment obligations only applied to "permits granted by" Woodway, Bellmead, and Beverly Hills, ROA.4781, and as such, the SICFAs terminated those city-issued permits, ROA.4238.  Prewitt further conceded the "only remedy" was for it "to get the permits back" after Charter stopped paying for those permits.  ROA.4238.

The IOAs, which are incorporated and part of the 1964 Agreement, contain the very same language as the settlement agreement that identifies the city permits at issue and provides for the same, exclusive reversion remedy.  *Compare* ROA.4781 & ROA.4783, *with* ROA.4643 & ROA.4645.

Following trial, the District Court issued its Findings of Fact And Conclusions of Law.  ROA.4027.  Examining the "unambiguous" terms of the 1964 Agreement "as a whole," the District Court held that Charter's payment obligations ended when it acquired SICFAs for each city.  ROA.4035–ROA.4036. It found the agreement expressly provided that the payment obligations "shall run with the permits," defined "permits" as "permits from the cities," and recognized that Prewitt "obtained permits from Texas Cities" of Waco, Temple, and

McGregor.  ROA.4035–ROA.4036.  As such, Charter's payment obligation under
the 1964 Agreement was tied to the "lives" of the city permits, which ended when
the PUC issued SICFAs to Charter that replaced them.  ROA.4036.  The District
Court also found that the local franchise regime in effect when the parties entered
the Agreements "affirm[ed]" the Agreements' "unambiguous language" that
"permits" applied only to those issued by cities – not SICFAs issued many decades
later under a fundamentally different state franchise scheme that was specifically
intended to terminate local permits like those granted by the cities long ago.
ROA.4036.

The District Court also carefully considered the IOAs and chattel mortgages
that incorporated and effectuated the 1964 Agreement.  ROA.4037.  It found the
IOAs, like the 1964 Agreement, provided that Charter's payment obligations "run
with the permit," meaning those payment obligations were necessarily conditioned
on the respective city permit existing and remaining in force.  ROA.4038.  The
District Court also recognized the IOAs contained "city-specific" language that
further supported its reading of the 1964 Agreement, including the provision that
identified any "new permit" as permits only "granted by" the cities of Waco,
Temple, or McGregor.  ROA.4038.  The District Court further found the IOAs and
chattel mortgages' reversion remedy confirmed that Prewitt only had a right to
payment tied to the city permits, and nothing more.  ROA.4038–ROA.4039.

Given that "Prewitt could not – and does not – claim any right to Charter's SICFA[s], which Charter acquired wholly without Prewitt," the District Court therefore held that Charter's payment obligation ended when it obtained SICFAs for each city.  ROA.4039-40.

The District Court additionally concluded the Savings Clause "does not affect" Charter's obligations under the Agreements.  ROA.4042.  It explained that, just as the Savings Clause did not "abrogate, nullify, or adversely affect in any way" the parties' rights, it did not alter Charter's ability to "repudiate" its payment obligation when it obtained SICFAs or affect the "provided-for remedy" – reversion of the city permits.  ROA.4042.  As the District Court recognized, that interpretation of the Savings Clause aligned with the views of the PUC, which is charged with enforcing the SICFA scheme, as a "provision preserving cable providers' existing third-party contractual obligations at the time they obtained a state-issued franchise."  ROA.4042–ROA.4043.

The District Court in turn rejected Prewitt's argument that the Savings Clause required the parties to treat the SICFAs as city permits to extend Charter's payment obligations in perpetuity.  ROA.4043.  It concluded that interpretation would "rewrite[ ]" the Agreements by profoundly expanding Charter's payment obligations far beyond what the parties had negotiated.  Instead of being keyed to the city permits, Charter's payment obligation would be free-standing and

perpetual. ROA.4043. By severing its payment obligation from the city permits, Charter would have "a broader obligation to continue paying royalties under the SICFA" and under "an entirely new franchising regime." ROA.4043. The District Court further recognized that Prewitt's interpretation would also "strip[ ] the Agreements of their bargained-for remedy" of reversion of the city permits "because Charter's obligations would continue even though" the city permits were terminated. ROA.4043. And the District Court recognized that Prewitt's interpretation – and the radical rewrite of the parties' Agreements it would work – raised a "host" of constitutional problems. ROA.4043.

The District Court ultimately concluded Prewitt was not entitled to damages or other relief. ROA.4047. When Charter stopped paying, the permits reverted to Prewitt. Accordingly, it entered a final judgment that Charter was "discharged" of its payment obligation and owed Prewitt nothing further. ROA.4050.[3]

## SUMMARY OF THE ARGUMENT

The District Court correctly concluded that Charter's payment obligations tied to the city permits terminated when it obtained SICFAs that Prewitt had no hand in obtaining under a new state-run franchise regime that was designed

---

[3] In light of its conclusions, the District Court had no need to (and therefore did not) address Charter's federal law arguments. ROA.4033. The District Court did, however, award Prewitt payments it received after Charter obtained SICFAs on ratification grounds. ROA.4045–4047. That included payments up to October 21, 2016, at which time Charter stopped paying Prewitt and the payment obligation terminated. ROA.4045–4047.

specifically to terminate and replace such stale local franchise permits.  This Court should affirm that sound judgment.

**I.**  The District Court correctly concluded the Agreements applied only to specific local permits issued by the *cities* and tied Charter's payment obligations to the life of those permits.  Each of the Agreements – the 1964 Agreement, IOAs, and chattel mortgages – expressly provided they apply to the city permits, and nothing else.  That interpretation makes good sense because, when the parties entered the Agreements, *only cities* could issue permits, and the permits issued conveyed valuable exclusivity rights.  The parties also tied Charter's payment obligations to the "life" of the city permits, meaning when Charter obtained SICFAs under a completely different regulatory regime installed many decades later, Charter's payment obligation ended along with the local permits.

**II.**  Prewitt's contrary interpretations – based on cherry-picking isolated terms and provisions – are seriously flawed.  They fly in the face of basic principles of contract interpretation and binding precedent, and ultimately generate an absurd and deeply unfair outcome inconsistent with the overriding purpose of the Texas Cable Act to do away with local franchises and attendant obligations.

**a.**  Prewitt argues Charter's payment obligation should continue apace because the SICFAs are "any new permits" under the 1964 Agreement.  But reading the Agreement as a whole, as the Court properly should, "any new

permits" just means any new *city* permits – a term the parties took care to expressly define.  By parsing each word separately and resorting to dictionary definitions, Prewitt turns a clear, unambiguous, and defined term into one that is hopelessly vague and ambiguous – and makes Charter's payment obligation a freestanding perpetual windfall, world without end.  A local city permit under an outmoded franchise regime becomes a SICFA, or whatever else may be needed down the road to keep payments flowing to Prewitt's heirs.

**b.**  Prewitt is mistaken that "any new permit" includes SICFAs – or any other franchise authority – because that lone term does not include "city."  But the purchase option under the 1964 Agreement only expressly applied to *city permits*, so it would make no sense for the parties to layer on requirements for some other permits in that same section.  Prewitt's own authorities, in which courts rejected parties' efforts to expand certain terms in isolation just as Prewitt attempts here, prove the point.

**c.**  Prewitt is incorrect that Charter's payment obligation is not limited insofar as it "shall run with the permits."  The Agreements elsewhere make clear that obligation only extends for the "life" of the city permits.  That is reinforced by the Agreements' breach and reversion remedy, which provides that Charter's payment obligation definitively ends upon reversion of the permits back to Prewitt.

**d.**  Prewitt is mistaken that the District Court improperly relied on the fact that, at the time the parties entered the Agreements, only municipalities could issue cable permits.  Texas law makes clear courts *should* consider just such circumstances to "confirm" the plain text of the Agreements, which is exactly what the District Court did here.

**e.**  Prewitt is also incorrect that the reversion remedy under the IOAs was only available to the original "assignee."  There is no textual, or other reasonable support for that interpretation.  As the successor-in-interest to that assignee, Charter assumed the original assignee's rights and obligations, and thus the IOAs reversion remedy applied when it stopped paying Prewitt for terminated city permits.  Prewitt's reading would have Charter bear the burden of perpetual payments without the parties' negotiated breach rights and remedies.

**III.**  The District Court correctly held the Texas Cable Act's Savings Clause is just that, not some radical – and unlawful – Modification (or Perpetual Payment) Clause.  As such, it saves – not modifies – *all* of the parties' rights and obligations under the Agreements.  Prewitt's preferred interpretation accomplishes just the opposite.  It rewrites the Agreements to make Charter's payment obligation free standing and perpetual, untethered to any meaningful endpoint – in the face of the parties' expressly negotiated end date (life of the city permits) and exclusive remedy for breach (reversion).  That misguided construction also creates serious

constitutional, federal, and state law problems the District Court properly avoided and so should this Court.

The Court should affirm the District Court.

**STANDARD OF REVIEW**

The Court reviews the District Court's ruling on statutory and contract interpretation *de novo*. *See In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 439 (5th Cir. 2002); *United States v. Arrieta*, 862 F.3d 512, 514 (5th Cir. 2017). In interpreting the parties' contracts, the contracts and record are "reviewed independently and under the same standards that guided the district court." *In re Liljeberg Enterprises, Inc.*, 304 F.3d at 439 (internal quotations & citations omitted). Given the District Court's ruling followed a bench trial, the Court reviews the District Court's factual findings for "clear error" and accords those findings "great deference." *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 232-33 (5th Cir. 2022). Applying these standards, the Court should affirm the District Court.

**ARGUMENT**

**I. The District Court Correctly Held Charter's Payments For The City Permits Terminated When It Obtained SICFAs For Those Cities.**

**1.** The District Court properly held that Charter's obligation to pay for city permits ended when it obtained SICFAs terminating those city permits. The SICFAs cannot reasonably constitute "new permits" issued by the cities and

-26-

subject to renewal under the plain and unambiguous terms of the Agreements given they were issued by the PUC, not the cities.  As such, Charter was no longer obligated to pay for the city permits after they were terminated.

The rules of contract interpretation are clear, and the District Court correctly applied them in concluding that "city permits" means just that: the permits issued by *the cities*.  Job one is to "examine and consider the entire writing and give effect to all provisions as written."  *Int'l Turbine Services, Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002) (applying Texas law); *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (same).  And where, as here, a contract is unambiguous, the Court need only apply the terms according to their "plain, ordinary meaning" and "in light of the circumstances present when the contract was entered."  *Denning*, 394 F.3d at 392 (internal quotations & citations omitted).

Here, by their plain terms, the Agreements only concerned the specific permits issued by cities, and Charter's payment obligation was tied expressly to the continued existence of those local government permits.  The very first page of the 1964 Agreement stated that Prewitt "obtained permits from Texas cities of Waco, Temple, and McGregor."  ROA.4626.  It is therefore no surprise that the agreement goes on to expressly define the terms "permits" and "city permits" as the "*permits from the cities.*"  ROA.4629 (emphasis added).  The agreement defined Ameco's purchase option as an "option to purchase such *city permits*," ROA.4629 (emphasis

added), and Prewitt had to assign the "*city permits*" to Ameco when it exercised that option, ROA.4632 (emphasis added).

The terms of the IOAs and chattel mortgages further support this straightforward reading of the 1964 Agreement. Because they incorporate the 1964 Agreement, they "must be read and construed together." *King v. Baylor Univ.*, 46 F.4th 344, 359 (5th Cir. 2022) (internal quotations & citations omitted) (applying Texas law); *supra* at 10–14. Each IOA referred to the permits as those "granted by the Cit[ies]" of Waco, Temple, and McGregor. ROA.4643, ROA.4649 & ROA.4654. That language clearly and specifically defines the permits as those issued by these three Texas cities. Even Prewitt agreed with that reading at trial, conceding the same "permits granted by" language in the IOAs that appears in the settlement agreement meant that Charter's payment obligation pertained only to the permits issued by those cities, *not Charter's independently-obtained SICFAs.* *Compare* ROA.4781, *with* ROA.4643; *supra* at 19.

Additionally, each mortgage defined the "certain permit" it secured as the actual permits issued by the cities of Waco, Temple, and McGregor, as well as the IOA for that particular permit. ROA.4658, ROA.4668 & ROA.4678. Taken as a whole, "the language" of the Agreements "unambiguously indicates" that Charter's payment obligation was tied to the specific permits issued by Waco, Temple, and McGregor. *Denning*, 394 F.3d at 394.

This interpretation is further supported by "the circumstances present" when the parties entered the Agreements. *Id.* at 393 & 395. At that time, cable operators had to obtain permits from cities, like Waco, Temple, and McGregor, to use public rights-of-way to construct and operate their cable systems. ROA.4611; *Hudson*, 265 F. App'x at 212. That is why the Agreements expressly and exclusively only reference and define the permits as those issued by the cities. *Supra* at 8–13. The Agreements do not identify or recognize any other possible cable franchising authority or regime because there was none when the parties executed the Agreements and for many decades thereafter, and the entire purpose of the Agreements was to compensate Prewitt for the exclusive city permits he had actually obtained, not some other separate, non-exclusive authorization the cable operator obtained on its own way down the road. ROA.4611; ROA.4036–ROA.4037. As the District Court properly found, the parties entered the Agreements "under the reasonable expectation and assumption that the cities, not the State, would issue cable permits." ROA.4036.

Given the parties intended for the Agreements to apply to the "city permits" – which were exclusive, and as such, extremely valuable – Charter's payment obligation ran "with the permit[s]" and only remained in effect during the "life of each such assigned permit and amendments." ROA.4630. Charter's payment obligation lasted only as long as the city permits existed and the cities had

authority to issue new, renewed, or extended permits.  Accordingly, when Charter

obtained SICFAs on its own, with no help from Prewitt, under an entirely different

non-exclusive state franchising scheme designed to displace the historic local

franchise regime, the city permits no longer existed and Charter no longer needed

to pay for them.  *See Int'l Turbine Services, Inc.*, 278 F.3d at 497.

**2.**  In response to the District Court's straightforward contract interpretation

– supported by the plain and unambiguous contract language, the parties' clear

intent, and the confirming surrounding circumstances of the Agreements – Prewitt

advances strained interpretations that find no support in the Agreements, are

unsupported by the law, and otherwise make no sense.  Br. at 25–40.  The District

Court rightly rejected Prewitt's flawed interpretations, which are just a bid to

convert the Agreements into a perpetual and unfair annuity for Mr. Prewitt's heirs.

**a.**  Prewitt argues that Charter's payment obligation continues to run because

the SICFAs constitute "any new permits" under the 1964 Agreement.  Br. at 27.

But Prewitt's preferred reading overlooks the express definitions in the

Agreements, divorces its chosen phrase from the "entire writing," and is

inconsistent with the clear intent of the parties as provided under the Agreements.

*Interstate 35/ Chisam Road, L.P. v. Moayedi*, 377 S.W.3d 791, 800-01 (Tex. Ct.

App. – Dallas 2012).

The 1964 Agreement expressly defined "permits" or "city permits" as "permits from the *cities*," ROA.4629 (emphasis added), which are identified as the "*cities* of Waco, Temple, and McGregor," ROA.4626 (emphasis added). Ameco had the option to "purchase such *city permits*." ROA.4629 (emphasis added). Three sentences later in the same section addressing the purchase option, Ameco agreed that "in the event *any new permit* is granted to Ameco . . . such new permit shall be conclusively treated and considered as a renewal of the *existing permit*, even if the terms thereof are new and different." ROA.4630 (emphasis added). Reading the contract as a "whole," *Forbau v. Aetna Life Ins.*, 876 S.W.2d 132, 133–34 (Tex. 1994), the meaning of the "any new permit" language is obvious: If Ameco obtained a new or amended permit issued *by the cities* of Waco, McGregor, and/ or Temple, then the "new permit" would be treated as a "renewal" of the prior city permit. ROA.4629. The parties could have, but did not, anywhere define the city permits to mean something entirely different: Any conceivable authorization to provide cable service whether then in existence or not, whether or not Prewitt had any involvement in obtaining such authorization, and whether or not such authorization was exclusive.

Prewitt nevertheless argues the Court should consider the phrase "any new permit" in isolation and apply its "common meaning" derived from dictionary definitions. Br. at 28. That approach is misguided. *First*, the "any new permit"

provision "*must* be considered along" with the other agreement terms, not apart from those terms. *Coker v. Coker*, 650 S.W.2d 391, 394-95 (Tex. 1983) (emphasis added). Yet, Prewitt asks the Court to consider the individual meanings of the words "any," "new," and "permit" based on dictionary definitions for each term instead of the terms as a whole, in context, and along with the Agreements' other related terms. That strained approach is "flawed" and properly "avoid[ed]." *LNG Americas, Inc. v. Chevron Nat. Gas*, 2023 WL 2920940, at *5 (S.D. Tex. Apr. 12, 2023) (rejecting arguments relying on dictionary definitions to analyze each word individually instead of the phrase as a whole).

*Second*, Prewitt's alternative definitions lead to an "absurd result." *Pavecon, Inc. v. R-Com, Inc.*, 159 S.W.3d 219, 222 & 224 (Tex. Ct. App. – Ft. Worth 2005); *see L & A Contracting Co. v. Southern Concrete Services, Inc.*, 17 F.3d 106, 110-11 (5th Cir. 1994); *RealPage, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 521 F. Supp. 3d 645, 656 (N.D. Tex. 2021). Prewitt's approach clouds an otherwise unambiguous term in service of a perpetual payment obligation the parties clearly had no intention of agreeing on. If "any new permit" includes SICFAs, Prewitt's heirs would receive perpetual payments for authorizations conferred by the PUC under an entirely different regulatory regime that Prewitt had no hand in obtaining. *Compare* ROA.4626 (referring to the city permits as those "Prewitt has obtained"), *with* ROA.4615 (Charter applied for and "obtained"

SICFAs).  The parties did not agree on such a ridiculous and deeply unfair

perpetual money for nothing windfall scheme unconnected to the city permits, and

there is no evidence otherwise.

Nor does Prewitt's dictionary definition of permit support its flawed

interpretation anyway.  Br. at 28.  While Merriam Webster's Dictionary defines

"permit" as any "written warrant or license granted by one having authority," Br. at

28, that broad and vague definition does not provide any "clear, direct, and

unequivocal" meaning of the term for Charter (or Prewitt) to apply in performing

their obligations.  *L & A Contracting Co.*, 17 F.3d at 110–11; *RealPage, Inc.*, 521

F. Supp. 3d at 655.  That is why the parties *expressly defined* the city permits under

the Agreements to avoid such hopeless confusion or ambiguity.  *Supra* at 8–13.

Prewitt's "common sense" argument is anything but – it injects vagueness into

otherwise simple and clear terms – and the Court should reject it, just as the

District Court did.

**b.**  Prewitt further argues that, by using the phrase "any new permits" instead

of "any new *city* permits," the parties intended for Section 2(b) to apply to

"permits" issued by governmental bodies other than a Texas municipality.  Br. at

29–31.  That is simply not so.  Under "basic tenets of contract law," Section 2(b)'s

"any new permit" provision "must be read together with the other sections of the

contract to comprehensively address the rights and obligations of all parties" and

"give effect" to the parties' intent as written. *Forbau*, 876 S.W.2d at 133-34. And here, the parties clearly intended the phrase "any new permits" to mean the "city permits" defined in the 1964 Agreement. *Supra* at 9–10. The "any new permit" provision falls under Section 2 of the agreement addressing Ameco's option to purchase the "city permits," subject to the "terms" of that section. ROA.4629; *supra* at 9–10. Those terms included the "any new permit" provision a mere three sentences later. ROA.4629. It would make no sense for the parties to have intended for the purchase option only to cover "city permits" issued by Waco, Temple, and McGregor, but then layer on a far broader and unlimited obligation tied to some other unidentified and entirely unknown authorizations the parties nowhere contemplate in the very same section as the purchase option expressly identifying the three specific city permits. ROA.4629.

While Prewitt invokes various cases in support of its argument that the parties intended "any new permits" to mean something other than the city permits as defined by the parties, those authorities actually do not support its argument and are readily distinguishable. Br. at 29–30. For example, in *URI*, the parties' contract did not define what "available" data URI, a uranium mining company, could consider as part of the parties' contracted-for process to determine water quality restoration requirements. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 770-71 (Tex. 2018). Kleberg County argued that "available" had to mean "publicly

-34-

available or otherwise known by the County," but the Court rejected that argument, reasoning the County's "proposed limitations" were not "expressed" in the contract. *Id.*

Unlike the contract in *URI*, the Agreements here *expressly* limited the referenced city permits to the "permits from Texas cities of Waco, Temple, and McGregor," ROA.4626, and also specified the duration of Charter's payment obligation ran with the "life" of those referenced permits, ROA.4630.[4] Any other interpretation would ignore and contradict the parties' expressly "bargained for" terms. *URI, Inc.*, 543 S.W.3d at 770.[5]

**c.** Prewitt additionally argues the Agreements' "shall run with the permits" provision does not actually impose any real durational limit on Charter's payment

---

[4] The remaining cases Prewitt cites are also inapposite. *See Feiss v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) (examining "standard form policy mandated by a state regulatory agency," which required the meaning of terms from the view of the "general public"); *The Monrosa v. Carbon Black Export, Inc.*, 359 U.S. 180, 182-83 (1959) (dismissing writ of certiorari for procedural reasons and not involving substantive contract interpretation); *Southwestern Gas Pipeline, Inc. v. Scaling*, 870 S.W.2d 180, 183-84 (Tex. Ct. App. – Ft. Worth 1994) (establishing the test for defining the term "profitable" specifically for oil and gas contracts).

[5] Prewitt also argues the IOAs further show the parties intended specifically to broaden the scope of the phrase "any new permits" because the IOAs separately provided the payment obligation will continue "in the event any new permit *is granted by the Cit[ies]*" of Waco, McGregor, and Temple. ROA.4662 (emphasis added); Br. at 38. But the IOAs incorporated the 1964 Agreement in its entirety, *supra* at 10–14, and as such, "must be read and construed together," *King*, 46 F.4th at 359 (internal quotation marks & cites omitted). Accordingly, the IOAs just further show the parties intended the payment obligation related to specific city permits, and not anything else.

obligation. Br. at 33–34. Once again, Prewitt conveniently focuses on one provision while ignoring others and the Agreements as a whole. The full section Prewitt refers to expressly limits the duration of Charter's payment obligation: It provides that Charter's payment obligation lasts only "*during the life*" of the city permits and "run[s] with the permits." ROA.4630 (emphasis added). Those provisions clearly and unambiguously tie Charter's payment obligation to the "lives" of the city permits. ROA.4630. If and when city permits no longer exist, neither does Charter's payment obligation. ROA.4630. That "event," as contemplated under the Agreements, expressly defines the duration and term of Charter's payment obligation. *Ins. Distribs. Int'l (Bermuda) LTD. v. Edgewater Consulting Grp. LTD.*, 2010 WL 3522312, at *13 (W.D. Tex. Sept. 8, 2010) ("[W]hen a contract is limited by a recognized contingency or an event of limited duration, then it is reasonable for a court to look to that contingency or event to imply a term for the contract.").

The Agreements' exclusive breach and reversion remedy further confirms that Charter's payment obligation is tethered directly to the existence of the city permits. Each of the IOAs and chattel mortgages provided that if Charter breached its payment obligation, the instruments would be "of no further force or effect" and the permits would revert back to Prewitt. ROA.4645; ROA.4651; ROA.4656; ROA.4658; ROA.4668; ROA.4678. Thus, if Charter stopped paying, the IOAs and

chattel mortgages terminated and so did its payment obligation. *Supra* at 10–13.
The parties' exclusive bargained-for remedy thus further confirms that Charter's
payment obligation was "tied" to the lives of the city permits. ROA.4039.

**d.** Prewitt further argues the District Court improperly relied on the
"circumstances surrounding" the local franchising regime in place at the time the
parties entered the Agreements. Br. at 34–37. But Texas law expressly allows –
indeed *encourages* – consideration of the "surrounding facts and circumstances . . .
as an aid in the construction" of an unambiguous contract. *First Bank v. Brumitt*,
519 S.W.3d 95, 110 (Tex. 2017) (internal quotation marks omitted). Such
circumstances include "the commercial or other setting in which the contract was
negotiated and other objectively determinable factors that give a context to the
transaction between the parties." *Houston Expl. Co. v. Wellington Underwriting
Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (internal quotation marks
omitted). A district court should properly consider these kinds of circumstances to
"inform" and confirm the "contractual text." *First Bank*, 519 S.W.3d at 110; *King*,
46 F.4th at 363.

That is exactly what the District Court did here. It considered a core
surrounding circumstance to which the parties actually stipulated: When the parties
entered the Agreements, cable franchising was handled at the local level, with
Texas *cities* granting valuable exclusive permits for cable providers to access

public rights-of-way and provide cable service.  ROA.4036 & ROA.4611.  That

undisputed context, along with the Agreements' plain terms, confirm the parties

contemplated a "city-by-city permitting system because that was the practice at the

time."  ROA.4036.  The District Court therefore appropriately found that the

surrounding circumstances related to the city permitting process "affirm[ed]" the

"unambiguous language" of the Agreements.  ROA.4036.  Its reliance on these

surrounding facts to "inform" the "contractual text" of the Agreements was wholly

proper and correct.  *First Bank*, 519 S.W.3d at 110.

**e.**  Prewitt lastly argues the IOAs' breach and remedy provisions do not

confirm that Charter's payment obligation terminated when it obtained the SICFAs

because Charter was not an "assignee."  Br. at 39.  But that argument fails on its

own terms, in light of the terms of the IOAs and the record evidence.  The IOAs

provided that "upon the breach of any such obligations by *assignee* hereunder," the

IOAs "shall be of no further force or effect and such permit shall automatically

revert" to Prewitt.  ROA.4645 (emphasis added).  According to Prewitt, the

reference to "assignee" instead of "assignee's assignee *or successor*" means that

only a breach by the initial assignee of the IOA (*e.g.*, the Ameco Subsidiaries)

would trigger the automatic termination and reversion remedies.  Br. at 39.  But

again, Prewitt's hyper-technical narrow focus on select words ignores the IOAs as

a "whole" and their otherwise plain meaning.  *Forbau*, 876 S.W.2d at 133-34.  The

IOAs provided that the "duties and obligations" of the IOAs "shall run with the

permit" and that *any* "assignment, transfer or encumbrance shall be subject to the

terms" of the IOAs.  ROA.4644.

Moreover, the parties stipulated that Charter is the "successor in interest" to

Ameco, ROA.4611 & ROA.4617, meaning it was "vested with the rights" and

"assumed the burdens" of Ameco under the Agreements.  *Sitaram v. Aetna U.S.*

*Healthcare of North Texas, Inc.*, 152 S.W.3d 817, 826 (Tex. Ct. App. – Texarkana

2004).[6]  Prewitt is therefore mistaken that Charter bears the burdens under the

Agreements, but cannot benefit from its rights and exclusive remedies under them.

## II.    The District Court Correctly Held The Savings Clause Does Not Radically Modify The Agreements To Create A Perpetual Payment Windfall For The Prewitt Heirs.

The District Court also properly held the Texas Cable Act's Savings Clause

does not mandate that Charter's payment obligation continue in perpetuity in the

face of the Agreements' contrary terms.  ROA.4041.  As the District Court held,

interpreting the Savings Clause in that way gives "full force and effect" to the

terms of the parties' Agreements, which furthers the Savings Clause's modest

intent – to preserve the "contractual rights, duties, and obligations" of the parties,

---

[6]  Prewitt also argues the reference to "this instrument" means that only the IOA, and not the 1964 Agreement, terminated in the event of breach.  Br. at 40.  Not so. The IOAs incorporated the 1964 Agreement in its entirety.  *Supra* at 8–14.

not radically modify them.  Tex. Util. Code § 66.004(f).  Prewitt's contrary

arguments are mistaken.

    **1.**  Prewitt is incorrect that the Savings Clause itself required Charter's

payment obligation to continue on forever.  Br. at 16.[7]  Prewitt misconstrues the

plain text of the Savings Clause.  Under well-established principles of statutory

construction, the Court is charged with "giv[ing] effect to the Legislature's intent."

*Texas Lottery Com'n v. First Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010).

To do so, the Court relies on the "plain meaning of the text as expressing

legislative intent" and presumes the Legislature "selected language in a statute with

care and that every word or phrase was used with a purpose in mind" and given

effect.  *Id.*; *In re Caballero*, 272 S.W.3d 595, 599 (Tex. 2008); *see also Wright v.

Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007) ("When we interpret a Texas

statute, we follow the same rules of construction that a Texas court would apply.").

    Here, the Savings Clause is just intended to ensure the Texas Cable Act does

not "abrogate, nullify, or adversely effect in any way" pre-existing "contractual

rights, duties, and obligations" between a cable provider and private party.  Tex.

Util. Code § 66.004(f).  It thus applies to all "liens, security interests, royalties, and

other contracts, rights, and interests" in effect on September 1, 2005, which

---

[7]  Prewitt argues the District Court only considered "thirteen words" of the Savings
Clause.  Br. at 16.  That is mistaken.  The District Court examined the entire
provision and even quoted it in full as part of its analysis.  ROA.4041.

necessarily includes the Agreements. *Id.* And the Savings Clause further provides

those Agreements "shall continue in full force and effect" and be "performed" by

"the holder of a [SICFA]" as if the cable provider "continued to operate under its

prior franchise or permit." *Id.*

The Savings Clause means "what it says": The Texas Cable Act itself does

not cancel the Agreements or the parties' attendant rights and obligations. *City of

Rockwall v. Hughes*, 246 S.W.3d 621, 628 (Tex. 2008). Charter's payment

obligation remained tethered to the life of the city permits. Those permits reverted

back to Prewitt and Charter's payment obligation terminated when Charter

obtained SICFAs and stopped paying Prewitt, just as the parties had bargained for

under the Agreements. *Supra* at 8–14; *see* Tex. Util. Code § 66.004(f). That plain

text reading furthers the Legislature's clear intent to ensure the Act did not

"abrogate, nullify, or adversely affect" pre-existing contract rights and ensure

parties' obligations could be "performed to the same extent" as before its passage.

Tex. Util. Code § 66.004(f).

Prewitt's preferred interpretation, by contrast, turns the Savings Clause into

an entirely different animal, and one that it was intended to prevent: Legislative

"impairment" of the parties' pre-existing contractual obligations. *Travelers' Ins. v.

Marshall*, 76 S.W.2d 1007, 1011-12 (Tex. 1934); *see* Tex. Util. Code § 66.004(f).

While the Agreements tie Charter's payment obligation to the "life" of specific

permits "from the cities," ROA.4629, Prewitt would have the Savings Clause

fundamentally rewrite the Agreements by replacing the city permits with SICFAs

issued many decades later by an entirely different franchising regime (and one that

was not identified or even considered in the Agreements) and remove any

durational limits on Charter's payment obligation. As the District Court explained,

Prewitt's construction also would write the parties' "bargained-for remedy – the

return of the City Permits to Prewitt upon Charter's breach" – right out of the

Agreements because Charter's obligations would continue on even though the city

permits had terminated. ROA.4043–ROA.4044. The District Court properly

rejected an interpretation of a Savings Clause that, far from saving pre-existing

rights and obligations, radically modifies them. So should this Court.

      **2.** Prewitt next summarily argues that interpreting the Savings Clause

merely to preserve existing contract rights somehow renders it "meaningless." Br.

at 19–21. Not so. A statute is rendered meaningless when it has "no function," *In

re Washington Prime Group, Inc.*, 642 B.R. 771, 775-76 (Bankr. S.D. Tex. 2022),

is "redundant," *City of Dallas v. TCI West End, Inc.*, 463 S.W.3d 53, 57 (Tex.

2015), or mere "surplusage," *Cambranis v. Blinken*, 994 F.3d 457, 465 (5th Cir.

2021). The District Court's straightforward interpretation creates none of these

issues. By interpreting the Savings Clause simply to preserve – but not modify –

the parties' contractual rights and obligations, the District Court ensured the Act

did not deprive the parties of the benefit of their pre-existing bargain.  There is nothing "meaningless" about that interpretation; it implements the Savings Clause's very purpose.  *TCI West End, Inc.*, 463 S.W.3d at 57.

**3.**  Prewitt also argues that the "host" of constitutional issues that would result from its interpretation of the Savings Clause should not be considered because the District Court did not specifically identify them in its decision.  Br. at 24; ROA.4043.  But the District Court correctly appreciated that Prewitt's interpretation of the Savings Clause to work a radical rewrite of the parties' Agreements to impose a perpetual payment obligation with no reversion remedy raises serious problems that should, if possible, be avoided.[8]

For starters, Prewitt's interpretation would run afoul of federal (and state) laws.  ROA.2204–ROA.2205.  It creates federal and state law preemption issues.  For if Charter were required to continue paying Prewitt a three-percent fee in perpetuity to provide cable services, that would exceed the federal and state five-percent franchise fee cap.  *See* 47 U.S.C. §§ 522(9)-(10), 542(b) & 556(c); Tex. Util. Code §§ 66.003 & 66.005.

Interpreting the Savings Clause to require Charter to pay Prewitt's heirs in perpetuity for SICFAs Prewitt had no hand in obtaining would also violate

---

[8]  Charter asserted constitutional violations and claims in its Complaint, multiple briefs, and at trial.  *See, e.g.*, ROA.1476–ROA.1479; ROA.2204–ROA.2211; ROA.4396–ROA.4405.

Charter's rights under the Speech and Equal Protection clauses of the U.S. and Texas Constitution, *see* U.S. Const. amend. I; Tex. Const. art. I, § 16; 42 U.S.C. § 1983; ROA.2205–ROA.2209, as well as the federal Contracts Clause, U.S. Const. art. I, § 10; ROA.2209–ROA.2211.[9]

## **CONCLUSION**

For the foregoing reasons, the Court should affirm the District Court.

---

[9] Prewitt argues the District Court improperly considered the PUC's views on the Savings Clause.  Br. at 21.  But that is doubly mistaken.  *First*, the PUC is charged with implementing the SICFAs scheme.  *See* Tex. Util. Code §§ 66.003 & 66.014. As such, its views are entitled to "respect."  *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).  *Second*, the District Court grounded its interpretation on the plain text of the Savings Clause and merely noted the PUC's comments "aligned" with that text.  ROA.4042–ROA.4043.

Dated: October 19, 2023

Respectfully submitted,

By: /s/ *Paul A. Werner*

Paul Werner
Steven P. Hollman
Imad S. Matini
Abraham J. Shanedling
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006
Tel: 202-747-1941
pwerner@sheppardmullin.com
shollman@sheppardmullin.com
imatini@sheppardmullin.com
ashanedling@sheppardmullin.com

D. Douglas Brothers
GEORGE BROTHERS KINCAID &
HORTON LLP
114 West 7th Street, Suite 1100
Austin, TX 78701
dbrothers@gbkh.com
*Attorneys for Plaintiffs-Appellees*

## **CERTIFICATE OF SERVICE**

I certify that on October 19, 2023, the foregoing was electronically filed through this Court's CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ Paul A. Werner*
Paul A. Werner

## **CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,875 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

*/s/ Paul A. Werner*
Paul A. Werner